PAWNEE COUNTY BANK, A NEBRASKA BANKING CORPORATION,
APPELLANT, V. KERMIT DROGE, APPELLEE.
411 N.W.2d 324

Filed August 28, 1987. No. 85-634.

James B. Gessford of Perry, Perry, Witthoff, Guthery, Haase & Gessford, P.C., and Michael J. Donahue and Victor Faesser of Witte, Donahue & Faesser, P.C., for appellant.

L. Joe Stehlik, for appellee.

BOSLAUGH, C.J., Pro Tem., WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

GRANT, J.

Plaintiff-appellant, Pawnee County Bank, a Nebraska banking corporation (hereafter Bank), brought this action in the district court for Pawnee County, Nebraska, against defendant-appellee, Kermit Droge, on a guaranty signed by Droge. The defendant affirmatively alleged that he signed the guaranty as a result of misrepresentation and undue influence by the Bank through the action of its officer and employee. A general jury verdict was returned in the defendant's favor. We reverse.

On October 12, 1984, the Bank filed a petition alleging that "Gary E. Droge, the son of the Defendant . . . for a valuable consideration executed in writing and delivered to Plaintiff a promissory note . . . for the total sum of $91,757.27, due, with interest, at maturity on March 8, 1984" and that "there is now due and owing upon said note the unpaid principal sum of $67,926.89 . . . ." The petition alleged, further: "ON May 12, 1983, the Defendant . . . for valuable consideration . . . executed in writing and delivered to Plaintiff a Guaranty guaranteeing to Plaintiff prompt payment of the foregoing promissory note," and "Defendant has failed to pay the same." The Bank's petition prayed for judgment against the defendant in the amount of $75,681.43, with interest and costs.

On February 11, 1985, defendant filed an amended answer and amended cross-petition. The trial court dismissed the amended cross-petition on the Bank's demurrer, and the case went to trial on the petition and defendant's amended answer, which generally denied the Bank's allegations and affirmatively alleged:

[P]laintiff, through its officer and employee, did coerce the defendant into signing the purported Guaranty;

. . . did exercise undue influence upon the defendant in order to force him to sign said purported Guaranty;

. . . induced defendant to execute the purported Guaranty by misrepresenting:

a. the financial condition of defendant's son, Gary E. Droge,

  b. the purpose of the purported Guaranty,

  c. the potential liability of defendant by signing said purported Guaranty.

Trial was held before a jury on May 20 and 21, 1985. At the conclusion of all the testimony the Bank moved for a directed verdict, alleging that the Bank proved the material elements of its cause of action and that defendant "failed to produce evidence sufficient to sustain his affirmative defenses of misrepresentation and undue influence." The court sustained the Bank's motion for directed verdict regarding "their burden of proof on the guaranty" and instructed the jury that defendant had executed the guaranty and was indebted to the Bank in the sum of $83,221.30, unless defendant proved his affirmative defenses of undue influence or misrepresentation. The issues of misrepresentation and undue influence were submitted to the jury.

On May 21, 1985, the jury returned a general verdict in favor of the defendant. The Bank filed a motion for judgment notwithstanding the verdict and a motion for new trial, both of which were denied on July 8, 1985.

The Bank timely appeals and assigns 11 errors, which may, for the purposes of this appeal, be consolidated into the following: (1) The court erred by submitting the issue of undue influence to the jury when there was a lack of sufficient evidence on this issue; (2) the court erred in submitting the issue of misrepresentation to the jury when there was a lack of sufficient evidence on this issue; and (3) the court erred in overruling appellant's motion for judgment notwithstanding the verdict.

In determining the sufficiency of the evidence to sustain a verdict, the evidence must be considered most favorably to the successful party and every controverted fact must be resolved in that party's favor, giving to the successful party the benefit of inferences reasonably deducible from the evidence. *Bell v. Williams Care Center, ante* p. 1, 409 N.W.2d 294 (1987).

The facts pertinent to the issues of undue influence and misrepresentation, stated in the light most favorable to the defendant, are as follows.

Gary Droge (hereafter Gary), the son of the defendant, had a

farming operation, which he financed through the Bank from 1976 to 1983. During that time Gary dealt primarily with Michael Platt, a loan officer employed by the Bank. Gary testified that early in May 1983, Platt advised him that the Bank would no longer extend credit and that Gary "had to get some help." Platt testified that he discussed Gary's 1983 financial statement with Gary. That statement showed total assets of $120,520, total liabilities of $120,164, and a present net worth of $356. Platt further testified that all of Gary's collateral had been pledged to the Bank or other lenders, and that he told Gary "we were going to have to have some additional collateral to shore up our line" and that the alternatives were "either to have someone to co-sign his [Gary's] notes with him or guarantee his line." Gary testified that he told his father, the defendant, that he was "in a little trouble up there at the bank, and that they mentioned maybe he could come up and talk to him, they wanted to talk to dad."

The defendant testified that on the day Gary asked him if he would go to the Bank, Gary "didn't tell me nothing about anything. I didn't know what the trouble was . . . . I never asked him what it was." Gary apparently arranged for a meeting for the defendant at the Bank on May 12, 1983.

The defendant, age 64 at the time of trial, testified that he was a partially retired farmer, had farmed since he was 16, and has an eighth-grade education. He and his wife owned a 320-acre farm in Pawnee County. Defendant was not a customer of the Bank other than to purchase vehicle insurance, and had never borrowed money from the Bank.

The defendant testified that on May 12, 1983, he went from his home in DuBois, Nebraska, to Pawnee City, Nebraska, to visit the Bank. Defendant testified further that he was an alcoholic, that he drank every day, that he drank on the way from DuBois to Pawnee City on May 12, 1983, and that he stopped in Pawnee City to buy liquor and drank again before he went to the Bank.

The defendant's wife, Margery Droge, testified that the defendant had been an alcoholic for a number of years and that she had no personal knowledge of how much the defendant had been drinking on the morning of May 12, 1983, but that she

knew "he wasn't in his right state of mind."

Defendant arrived at the Bank around noon and met with Platt alone in his office. Defendant testified that he had never met Platt before. The meeting between Platt and the defendant took 20 to 30 minutes.

The defendant testified that "I walked in and sit down, and I guess mentioned something about, 'You've got something around here that Gary wanted for me to see.' . . ." Defendant further testified that Platt told him "he [Platt] believed he [Gary] could be — come out of this all right . . . . He said he figured out his deal, whatever he called it, and he could see that he could make it all right . . . . No reason why he couldn't." Platt then showed the defendant a computer printout of the cash-flow of Gary's farming operation. This printout was titled "Monthly Cash Budget—Agriculture," and had been prepared by the Bank between March and May of 1983 from information provided by Gary. The defendant testified that he did not ask any questions about the cash-flow statement and that it "was chicken tracks as far as I was concerned. I didn't know what that thing was. . . . I didn't know what he was talking about." It was Platt's uncontroverted testimony that he believed he indicated to the defendant what Gary's debt was at that time, "because it's the very first figure on the sheet." The cash-flow statement showed a "short term bank debt [expressed in $000]" of "93.6" for the month of January 1983, "101.4" for May 1983, and "45.7" for December 1983. Gary testified that at the time he talked to his father in early May of 1983 about visiting the Bank, he owed the Bank over $90,000.

Defendant testified that Platt also told him "Gary was supposed to get a job. . . . [H]e was getting a job. It was 'prise to me; I didn't know how you get a job and farm both, but that's what he said, he was getting one." The defendant stated that the conversation in the meeting up to this point had taken approximately 5 minutes.

After this discussion, Platt spent 10 to 15 minutes taking a financial statement from the defendant, based on information given at that time by the defendant. Defendant signed the financial statement. The defendant then testified that Platt "went and got . . . [t]hat guaranty thing, and printed something

on it, and put it in front of me to sign." The defendant further testified that he signed the guaranty

> after I told him I said I never seen one of these things, don't know what it means. He never said anything and I kind of glanced through the thing. I did see that 125,000, I didn't know what that meant, I never seen anything else. I didn't even try to look at it . . . I don't know why I signed it . . . .

Platt testified that the guaranty form was a standard guaranty form used at the Bank. The guaranty signed by defendant had the word "GUARANTY" in bold letters at the top of the form and stated in pertinent part as follows:

> I hereby request <u>Pawnee County Bank</u> hereinafter called the "Bank" to give and continue to give credit to <u>Gary Droge</u> and in consideration of all and any such credit given, I hereby unconditionally guarantee prompt payment to the Bank when due, of any and all notes at any time made by said debtor to said Bank and any renewal or renewals thereof, together with any other indebtedness (now existing or hereafter incurred) of said debtor to said Bank arising from borrowings, overdrafts, notes discounted or otherwise. The Bank shall not be required to first proceed against the debtor on any past due obligation, this Guaranty being absolute in respect to prompt payment. Any and all renewals, extensions, modifications, or alterations of any indebtedness or obligation of the Guaranteed to the Bank are expressly made upon the faith and credit of this Guaranty, and are the consideration for the extension of this Guaranty.
>
> My liability herein shall not exceed <u>One Hundred Twenty Five Thousand and no/100</u> . . . .

Defendant testified that he did not ask any questions about the guaranty form, and did not ask any questions all day, because he "was in a kind of a stupor, you'd call it . . . ."

Defendant further testified that Platt did not tell defendant the effect of the guaranty form and did not show the defendant Gary's financial statement before defendant signed the guaranty. Platt testified that Gary's loan file was on his desk during the meeting with the defendant, and contained both

Gary's cash-flow statement and his financial statement for 1983 which showed Gary's present net worth of $356.

On cross-examination the defendant testified that he saw the figure "125,000" on the guaranty form, but that he "never read anything on the thing." The following cross-examination ensued:

Q Besides you and Mike Platt, there was no one else?

A No.

Q Did you want to leave at any time before you were finished with everything?

A I don't know —

Q Did you indicate the desire to leave to anybody?

A I guess not.

Q Okay. Was there anything that prevented you from just saying, "Goodbye, I'll think about it."

A No, I guess I was too dopey to know what was going on on that part. I just sat there.

Q You were free to walk out —

A I suppose I was free there.

Q You were free to walk out of the bank anytime?

A I suppose I was.

Q Nobody was restraining you, holding you?

A No, they wasn't holding me.

Q Physically?

A No.

. . . .

Q Okay. Did Mike Platt make any physical threats to you —

A No.

Q — on May 12?

A No, he didn't make no physical threats.

Q Did he make any threats of an economic nature to you?

A No. He was very pleasant.

The defendant testified that he did not request to take the papers home or to have an attorney look at them before signing them.

Two weeks later, Gary went to the Bank to get a copy of the guaranty for defendant. Defendant testified that up to then he

did not know what he had signed and that "I seen what it meant then after I sat down and worked it over." The defendant stated that he did not go back to the Bank after he discovered what he had signed, and did not do anything about it. After the guaranty was signed, the Bank continued to renew Gary's bank notes. On November 23, 1983, the defendant was notified by letter that the Bank was liquidating Gary's assets, that they would apply the proceeds to the debt at the Bank, and that they would look to defendant to cover any shortages.

We first consider whether there was sufficient evidence of undue influence by the Bank to submit the question to the jury. Initially, it is clear that a defendant must prove all elements of an affirmative defense. *Erftmier v. Eickhoff*, 210 Neb. 726, 316 N.W.2d 754 (1982).

In order to establish a defense of undue influence, the party asserting the defense must show clearly and convincingly that the party who executed the instrument was subject to undue influence, that there was an opportunity to exercise undue influence, that there was a disposition to exercise undue influence for an improper purpose, and that the result was clearly and convincingly the effect of such undue influence. *In re Estate of Massie*, 218 Neb. 103, 353 N.W.2d 735 (1984); *McDonald v. McDonald*, 207 Neb. 217, 298 N.W.2d 136 (180).

Mere suspicion, surmise, or conjecture does not warrant a finding of undue influence, but there must be a solid foundation of established facts on which to rest the inference of its existence. *McDonald v. McDonald, supra*. The jury's findings concerning undue influence are determinations of fact. This court's standard of review is whether such findings are supported by sufficient evidence, and the findings are not to be disturbed unless clearly wrong. *In re Estate of Massie, supra*.

Our review of the record shows that the defendant failed to establish in any way the elements required to show undue influence. We note that we are not presented, in this case, with ordinary concerns where undue influence is involved; that is, there are no such questions as the influence exerted by an adult child over an aging parent or that exerted by someone over an incompetent. In this case, defendant was not subject to any undue influence. Defendant voluntarily went to the Bank—not

at the Bank's request but at his son's specific request. Defendant was free to leave when he chose and admittedly was not subject to any physical or economic threats. He was a wealthy, retired farmer who chose voluntarily to go to the Bank to discuss his son's affairs. This state of facts is far different than those in the case of *Haumont v. Security State Bank*, 220 Neb. 809, 374 N.W.2d 2 (1985), where the guarantor testified that a bank official threatened to prosecute and jail the guarantor's son if the guarantor did not sign the guaranty.

Further, we cannot determine that there was opportunity to exercise undue influence. The meeting between defendant and the bank's employee was open, cordial, and pleasant, by defendant's own testimony.

Further, there was no evidence showing a disposition on the part of Platt, an officer and employee of the Bank, to exercise undue influence on the defendant, for an improper purpose, when defendant signed the guaranty form.

In connection with all of these matters, the defendant testified that he was not a customer of the Bank and had never met Platt before May 12, 1983. The defendant met with Platt at the request of his son, Gary. It was Platt's uncontroverted testimony that he did not call the defendant to come in and that he did not know of anyone at the Bank who called him in. The record shows that the defendant signed the guaranty in the absence of any physical or economic threats from Platt, and there were no constraints on defendant's liberty. The defendant did not testify to any statements made to him by Platt or to any other facts which would show that Platt had a disposition to exercise undue influence on the defendant for any improper purpose. Even considering the facts in a light most favorable to the defendant, defendant has failed to show any evidence of the essential elements of undue influence. The only influence on defendant appeared to be a natural desire to help his son. We conclude that as a matter of law there was insufficient evidence of undue influence, and the court was clearly wrong when it submitted that issue to the jury.

The record also shows that there was a lack of sufficient evidence of misrepresentation to submit that issue to the jury. In order to show misrepresentation, the party alleging it must

plead and prove the following elements: (1) that a representation was made; (2) that the representation was false; (3) that the representation was known to be false when made, or was made recklessly without knowledge of its truth and as a positive assertion; (4) that it was made with the intention that the plaintiff should rely on it; (5) that the plaintiff reasonably did so rely; and (6) that the plaintiff suffered damage as a result. See *Forker Solar, Inc. v. Knoblauch*, 224 Neb. 143, 396 N.W.2d 273 (1986).

Defendant failed to present any evidence to show that the statements made to defendant by Platt were known to be false when made (or indeed that the statements were false at all), or were made recklessly, without knowledge of their truth and as positive assertions. Defendant's brief on appeal provides little help to determine which statements made by Platt were alleged to be a misrepresentation of facts. It appears from defendant's brief that the questionable statements made by Platt were that defendant's son, Gary, " 'would make it' " and that Gary "was getting a job." Brief for Appellee at 6. The Bank asserts in its brief on appeal that the defendant's claim of misrepresentation rests upon the following: "(1) that Mike Platt said 'he believed he [Gary Droge] . . . could come out of this all right'; (2) that Mike Platt said Gary Droge 'was going to get a job'; and (3) the failure of Mike Platt to show defendant/appellee his son's financial statements even though he didn't ask to see them." Brief for Appellant at 30. The statement by Platt that Gary "could come out of this all right" was in regard to the future success of Gary's farming operation. Platt testified that he showed the cash-flow statement to defendant and said, " 'This is where Gary's debt's at now. Looks like if things are averaged through the year,' that's what we always tried to base them on was an average crop yield and average price, 'it looks like Gary will make some progress through the year.' "

Although Platt did not show the defendant Gary's financial statement, Platt was under no obligation to do so. Defendant did not request to see it. Platt testified that the amount of Gary's debt which defendant was asked to guarantee would have been discussed at the meeting with defendant.

The statement that Gary "was going to get a job" also

concerned a future event. Generally, fraud cannot be based on predictions or expressions of mere possibilities in reference to future events. *In re Estate of Hesemann*, 214 Neb. 842, 336 N.W.2d 568 (1983). The exception to the rule is that fraud may be predicated on the representation that an event which is in control of the maker will, or will not, take place in the future, if the representation as to the future is known to be false when made, or is made in reckless disregard as to its truthfulness or falsity and the other elements of fraud are present. See *Mueller v. Union Pacific Railroad*, 220 Neb. 742, 371 N.W.2d 732 (1985).

Whether Gary's farming operation would be successful and he would "come out of this all right," that is, reduce or be able to pay his debt at the Bank, was not an event which was in the control of Platt, the maker of the statement. Neither was Platt's statement that Gary "was going to get a job" an event within Platt's control.

The record shows that defendant failed to establish misrepresentation. We find that as a matter of law there was insufficient evidence of misrepresentation, and that issue should not have been submitted to the jury.

The judgment is reversed and the cause remanded with directions to enter judgment for the Bank on its petition.

REVERSED AND REMANDED WITH DIRECTIONS.

KRIVOSHA, C.J., not participating.